## CONNOLLY v. LANG.
### No. 4949.

Circuit Court of Appeals, Seventh Circuit.
Dec. 19, 1933.

Milton J. Foreman, Lazarus Krinsley, and Raymond Harkrider, all of Chicago, Ill., for appellant.

William B. Gemmill and Theodore L. Hamer, both of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and PAGE, Circuit Judges.

SPARKS, Circuit Judge.

Appellee brought this action against appellant and the bank for which he was receiver, to establish a preferred claim in the amount of $8,500. The amount of the claim is not controverted. The court, under Equity Rule 70½ (28 USCA § 723), found the facts specially, and in substance they are as follows: Jackson Park National Bank of Chicago, which is hereinafter referred to as the Bank, was a national bank doing business in Chicago on June 22, 1932. Prior to that date, appellee had opened a savings account with the Bank, and on June 22, 1932, there were credits in her favor in that account in the total sum of $9,642.73. On the morning of that day she went to the Bank and on her own initiative without speaking to anyone she made out a savings withdrawal receipt for her entire deposit, and presented it, with her savings pass book, to the manager of the Savings Department, asking her with which down town bank the Bank did business. In response, the manager said, "The Continental." The manager thereupon went to the ledger, pulled the ledger sheet, and made an entry in the pass book, asking appellee if she wanted currency or a cashier's check. In response she stated that she was going to take the money to their down town bank to get a draft or whatever was necessary in order to take the money to Europe. She was then advised that the Bank could perform that service for her, and referred to another employee of the Bank for that purpose. In consultation with him, appellee selected a bank in Copenhagen as her foreign depository, and he informed her that the Bank would give its draft on the Central Hanover Bank and Trust Company of New York, hereinafter referred to as Central Hanover. Appellee thereupon left $8,500 at the Bank, and took with her in currency $1,142.73, which was the difference between her deposit account and the draft. The Bank as agent of appellee then mailed the draft to the selected bank of Copenhagen, together with its letter and identifying signatures, and delivered to appellee a copy of that letter and the Bank's receipt for the draft. At that time the Bank did not have sufficient funds with Central Hanover to meet the draft, and it therefore immediately wired $5,000 to Central Hanover to meet the deficiency. The next day the Bank did not open. The receiver took charge of the Bank's credit in Central Hanover amounting to $4,377.58, and the draft was dishonored and returned.

Upon those facts the court based the following conclusions of law:

1. "That the relationship of creditor and depositor * * * was terminated at the time the withdrawal receipt and pass-book were presented, the 'ledger-sheet pulled' and entry made, and she stood in the same relationship to the bank as if she had brought into the bank $8,500 and given it to the bank officer for transmittal.

2. "That the account of plaintiff was not charged with the amount of the draft.

3. "That the assets of the bank were augmented by the sum of $8,500.

4. "That the title to said sum was not in the bank.

5. "That the defendant was merely the agent of the plaintiff for the transmittal of the fund.

6. "That the plaintiff is entitled to a preference.

7. "That at the time of the closing of the Jackson Park * * * Bank * * * it had on hand more than the amount of the plaintiff's claim in cash and that the defendant, J. T. Connolly, as Receiver, came into possession thereof."

Judgment was thereupon rendered for appellee in the sum of $8,500 as a claim preferred over general creditors. From that judgment this appeal is prosecuted.

It will be noted that what purport to be conclusions of law numbered 2 and 7 are clearly findings of fact, and there is nothing in the findings of fact to support those conclusions. It is quite true that the evidence, if we were permitted to consider it for that purpose, might support those conclusions, but under Equity Rule 70½ we are limited by the findings of fact, if they are substantially supported by the evidence, and they are thus supported in this case, with one exception. If the findings were not sufficiently broad, each party had a right to call that fact to the

attention of the court, but that was not done here. On the contrary, neither party objected to the findings, hence we are concerned only with the question: Are those findings, which are supported by substantial evidence, sufficient to sustain the conclusions of law and the judgment? We are convinced that they are not sufficient.

The finding of the court that "the receiver took charge of the credit in the Central Hanover" is not controverted, but the findings fail to disclose the amount of that credit. The other findings quite strongly indicate that that credit balance was at least $5,000, which was the amount received by wire on June 22, 1932. The result of that wire was to immediately transfer $5,000 from the Bank's cash balance in Chicago to Central Hanover. This was to be applied to the payment of the draft of $8,500. If, as appellee contends, a trust arose in her favor with respect to the entire sum of $8,500, it is quite clear that $5,000 of that amount was transferred to Central Hanover, and was thereby deducted and segregated from the funds in Chicago for the purpose of carrying out the terms of the alleged trust, and that amount could not again be deducted from the general funds of the Bank, as against the general creditors.

■ Before appellee can recover against appellant, the evidence must show that appellant actually received the alleged trust funds, either segregated or intermingled with other funds, and he can not be held for the payment of any part of the fund which he has not thus received. Schuyler v. Littlefield, 232 U. S. 707, 34 S. Ct. 466, 58 L. Ed. 806; Hirning v. Federal Reserve Bank (C. C. A.) 52 F.(2d) 382, 82 A. L. R. 297; Mark v. Westlin (D. C.) 48 F.(2d) 609. It is admitted that appellant only received from Central Hanover the sum of $4,377.58 which was the amount of the Bank's credit balance. It is obvious, therefore, that there was $622.42 of the alleged trust fund of $8,500 which appellant never received.

■■ The findings of fact do not disclose that appellant ever received more than $4,377.58 of the $8,500, even if we take into consideration the seventh conclusion of law. While it is found that at the time the Bank was closed it had on hand more than the amount of appellee's claim in cash, which appellant received, yet that does not necessarily mean that that sum included any part of appellee's money. The cash balance of the Bank, if any, at the beginning of business on June 22, 1932, is not disclosed, nor are the deposits and withdrawals shown for that day.

Those facts if shown would reveal what funds, if any, the Bank had at the time of appellee's transaction. If, at that time, there were no funds in the Bank except the amount she received in cash, and the amount wired to Central Hanover, then it is clear that there would have been no funds to which the alleged trust could attach except the money held by Central Hanover. If the trust is once depleted, it can not be built up by subsequent deposits of other depositors. Schuyler v. Littlefield, supra; Blumenfeld v. Union National Bank (C. C. A.) 38 F.(2d) 455; In re Brown (C. C. A.) 193 F. 24. We cannot say that the cash balance of the Bank on the morning it failed to open was not received by the Bank subsequent to appellee's transaction.

Moreover, we are convinced that no trust arose in appellee's favor with respect to any part of the $8,500, because there was no augmentation of assets and for the further reason that the relation between appellee and the Bank at all times referred to was that of debtor and creditor. Nominally this action is between appellee and the receiver of the defunct bank, but the real controversy is between appellee and the other creditors of the Bank. Beard v. Independent District of Pella City (C. C. A.) 88 F. 375; Fagan v. Whidden (C. C. A.) 57 F.(2d) 631.

In order to establish a trust relationship between the Bank and appellee with respect to the $8,500, it was incumbent upon her to establish the fact that the assets of the Bank were augmented to that extent by her transaction on June 22, 1932, and this we think has not been done. It is true that she presented to the cashier her receipt for the full amount of her deposit, and at that time she intended to take the entire amount to the Continental Illinois National Bank, in order to get a draft, or whatever was necessary to take the money to Europe. When she was advised, however, by the officer of the Bank that he could attend to that matter for her, and that he could give a draft on Central Hanover, and would send it for her to a bank of her own selection in Copenhagen, she readily assented. She thereupon received from the Bank $1,142.73 in cash, and the Bank retained the $8,500 for which it actually issued a draft upon Central Hanover which it mailed to the Copenhagen bank with instructions to credit that amount to appellee.

■ From these facts and the further facts that her pass book was retained by the Bank and an entry made thereon showing that the entire amount had been drawn out and the ledger sheet pulled, appellee argues that it

must be considered that she actually received possession of all the money and thereafter returned it to the Bank officer, thereby augmenting the assets of the Bank. Of course, she never actually had the $8,500 in her possession, and we think we are not warranted in indulging in that fiction as between appellee and the other creditors. What she actually did was to place her receipt for the entire amount in the hands of the cashier with instructions to issue the draft according to the agreement and to pay her the balance in cash.

In McNair v. Oesterreicher (C. C. A.) 63 F.(2d) 876, appellee had endorsed and delivered to the bank its certificate of deposit drawn in his favor, with instructions to use it in the purchase of bonds for him, or to cash it for him in case bonds could not be purchased. It was contended by appellee in that case that the legal situation was the same as if he had cashed the certificate and had then proceeded to hand the money back to the bank under a specific agreement that it was to be held as a special fund for the purposes mentioned. The court said: "We need not undertake to determine what appellee's rights would be if he had in substance done just this, * * * for we think it quite plain that he did no such thing." The court accordingly held there that there was no trust.

In Blakey v. Brinson, 286 U. S. 254, 52 S. Ct. 516, 517, 76 L. Ed. 1089, 82 A. L. R. 1288, a savings depositor of a national bank, pursuant to conversations with his bank's officers, increased his account by deposit in the usual way, to an amount sufficient to pay for some bonds, which the bank had undertaken to purchase for him. Thereafter the officer told him that he had his bonds, and handed him a charge slip showing the cost, including principal, accrued interest, and commission. The total was charged against the depositor's account and was credited on the bank's books as a deposit in a bond account. When the bank soon afterwards closed its doors, it was discovered that in fact no bonds had been purchased, ordered, or received for the depositor. The court disregarded the debit entry and held that no trust had been created and that the depositor continued to be a general creditor. Mr. Justice Stone, speaking for the court, said,

"The court below thought that the legal consequence to be attributed to the debiting of the account with the supposed purchase price of the bonds was the same as if the respondent had cashed a check for the amount and had then proceeded to hand the money back to the bank under a specific agreement between him and the bank that the money was to be held as a special fund, for the sole purpose of completing the purchase. This view is not without support. [Citing cases.] Such a procedure, if actually carried out, might afford a basis, which is lacking here, for the inference that respondent, no longer content with the rôle of creditor, had sought to establish a trust fund. But the mere debiting of his account, without more, for the reimbursement of the bank for the obligation which it was supposed to have incurred or paid, lends no support to such an inference. The cancellation of the credit balance by the debit neither suggests any intention to establish a trust nor points to any identifiable thing which could be the subject of it."

It is not denied that if appellee had given her check to the Bank on her funds then on deposit for $8,500 in payment of the draft, no trust would have arisen, because the transaction would not have augmented the assets of the Bank. If the Bank's entries on her pass book and on the Bank's books of account disclose that the $8,500 was first paid to her and that she thereupon returned it to the Bank in payment of the draft, they disclose facts which are admittedly not true, and under such conditions the entries will be disregarded in so far as they are inconsistent with the facts. If this were a controversy only between appellee and the Bank there might be good reason for permitting fiction to pervert the facts because all the equities would be with appellee. This action, however, is really between appellee and the general depositors, who without fault on their part have been placed in positions which no doubt are equally deplorable and whose rights to have equity done are equally worthy of consideration.

For the reasons hereinbefore stated, the decree is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.